## State of Vermont v. Rebecca S. Durenleau

[652 A.2d 981]

No. 93-168

Present: **Allen, C.J., Gibson, Dooley, Morse and Johnson, JJ.**

Opinion Filed September 30, 1994

Motion for Reargument Denied November 2, 1994

*Scot L. Kline,* Chittenden County State's Attorney, and *Pamela Hall Johnson* and *Rosemary Hull,* Deputy State's Attorneys, Burlington, for Plaintiff-Appellee.

*Peter F. Langrock* and *Beth Robinson* of *Langrock Sperry & Wool,* Middlebury, for Defendant-Appellant.

**Allen, C.J.** Defendant Rebecca Durenleau appeals her conviction following a jury trial for the first-degree murder of her husband, Michael Durenleau. Defendant contends that the State failed to present sufficient evidence to establish her guilt beyond a reasonable doubt. We agree and reverse.

Defendant claims a number of errors on appeal, but in light of our disposition of this case we consider only her claim regarding insufficiency of the evidence. At the close of the State's case and after trial, defendant unsuccessfully moved for a judgment of acquittal pursuant to V.R.Cr.P. 29, which provides, in relevant part, that "[t]he court on motion of a defendant . . . shall order the entry of judgment of acquittal . . . if the evidence is insufficient to sustain a conviction." In reviewing a denial of a Rule 29 motion, this Court must determine whether the evidence presented by the State, taken in the light most favorable to the prosecution and excluding any modifying evidence, sufficiently and fairly supports a finding of guilt beyond a reasonable doubt. *State v. Poirier*, 142 Vt. 595, 599, 458 A.2d 1109, 1111 (1983); see also *State v. Robar*, 157 Vt. 387, 391, 601 A.2d 1376, 1378 (1991). The evidence must be examined both for its quality and strength; evidence "that gives 'rise to mere suspicion of guilt, or [leaves] guilt uncertain or dependent upon conjecture' is insufficient." *Robar*, 157 Vt. at 391, 601 A.2d at 1378 (alteration in original) (quoting *State v. Partlow*, 143 Vt. 33, 37, 460 A.2d 454, 456 (1983)).

At trial, the State proceeded on the theory that defendant aided or incited her lover, Harmon Olmstead. To convict defendant, the prosecution had to prove that Olmstead unlawfully killed Michael Durenleau, wilfully and deliberately, with premeditation, and that defendant aided or incited him in that killing. See 13 V.S.A. § 2301 (defining first-degree murder); *id.* § 3 ("A person who aids in the commission of a felony shall be punished as a principal."); *id.* § 4 ("A person who is accessory before the fact by counseling, hiring or otherwise procuring an offense to be committed may be . . . convicted . . . as if he were a principal offender . . . ."); see also *State v. Miller*, 146 Vt. 164, 175, 502 A.2d 832, 839 (1985) (jury must conclude beyond reasonable doubt that preconceived plan to murder existed in which defendant participated). For purposes of discussion, we assume that the State proved beyond a reasonable doubt that Olmstead unlawfully killed Michael Durenleau wilfully and deliberately, with premeditation.[*] We recount the facts relevant to defendant's participation in the light most favorable to the State, excluding modifying

---

[*] At the time of argument, Olmstead had not been charged with any crime in connection with the killing.

evidence. Defendant carried on an adulterous affair with Olmstead starting in mid-1984. She had filed for divorce in August 1984 to be free to marry Olmstead, but expressed concern to her mother that she might lose the house and custody of the children in the process. Defendant dropped the suit, but she and her husband were separated during two periods before his death while the affair ensued. At one point in late 1984, defendant said to a friend that she wouldn't have so many problems if her husband were dead. Defendant also knew that her husband had a life insurance policy naming her as beneficiary. She claimed not to know that the death benefit had been increased in the spring of 1985, but the insurance agent who arranged the increase testified that defendant was aware of the policy's status.

Around that same time, spring 1985, defendant told her mother she was going through with the divorce to marry Olmstead. At some point before the homicide, defendant told Olmstead that she would resume sexual relations with her husband unless Olmstead "proved himself." In June 1985, defendant claimed to have ended the affair and to have reconciled with her husband, but she was seen with Olmstead at a Fourth of July party approximately one week before the killing. Witnesses testified that in the year before the killing, Olmstead and Michael Durenleau had exchanged threats and engaged in hostile physical encounters.

Three days before the murder, the Durenleaus planned a reconciliation celebration at Veronica's Tavern in Essex, a place where defendant and Olmstead had been seen together at some time in the past year. As arranged, on the evening of July 12, 1985, defendant and her husband left their Swanton home and headed for the tavern. They arrived at approximately 9:30 p.m. and defendant parked the car in an unlit area behind a building located to the rear of the tavern. The lot adjoined a grassy embankment topped by train tracks and a lumberyard, and contained other parked automobiles and debris. The Durenleaus entered the bar together, found a table, and ordered a beer. After driving nearly thirty miles from Swanton to Essex, they stayed only fifteen minutes and left without finishing the beer. Defendant and her husband went back to the car; defendant went to the driver's side and her husband to the passenger's side.

Without warning, Michael Durenleau was struck in the back of the head with a blunt instrument and stabbed twice in the heart. Defendant later recalled she heard her husband say, "I've had enough," just after the assault started. Defendant later reported her husband's attacker was approximately five feet four inches tall and

could have been male or female. Another witness reported seeing a man of Olmstead's size, about six feet, and a truck similar to Olmstead's in the vicinity of the back parking lot around the time of the assault. Defendant ran back into the bar and shouted that her husband had been hit, but did not immediately say he was in the back parking lot. Some of the bar patrons exited the front door and went the short distance into the street, apparently believing that the husband had been hit by a car. Defendant then came out of the bar and indicated that her husband was lying in the back lot. Defendant stood away from her husband as the bar patrons and a rescue unit attempted to revive him.

Two days after the assault, defendant went to a friend's house, uncharacteristically, without calling first. The friend had just returned from Ohio where she and her family intended to relocate, and defendant mused that she and Olmstead should consider moving there as well because they would not be able to live in Swanton. A short time later that same day, Olmstead called the friend's house, expecting to find defendant there. Defendant spoke to him privately, but was overheard telling him that things would be all right. Over the next three weeks, defendant took ten to fifteen calls from Olmstead at the friend's house.

Sometime after the killing, Olmstead told defendant that he had "proven himself." Defendant started referring to Olmstead by his attorney's name "Dick Gadbois." She used the money from her husband's life insurance to buy land from Olmstead, where they erected a house and moved in together, sometime in 1989 or 1990. Defendant, Olmstead and her children lived there until just before trial.

■ The State acknowledges that the evidence against defendant was entirely circumstantial, but contends the prosecution proved beyond a reasonable doubt that defendant procured, incited, or participated in her husband's murder. Despite its circumstantial nature, such evidence may serve as proof of guilt beyond a reasonable doubt, provided the evidence is "proper and sufficient in itself." *State v. Warner*, 151 Vt. 469, 472, 560 A.2d 385, 387 (1989). In assessing circumstantial evidence, the fact-finder may draw rational inferences to determine whether disputed ultimate facts occurred. *Id.* at 472–73, 560 A.2d at 387–88. "In addition, the State is not required to exclude every reasonable hypothesis of innocence in proving a case with circumstantial evidence." *Id.* at 472, 560 A.2d at 387. The evidence and inferences, however, must add up to more than mere suspicion; the

jury cannot bridge evidentiary gaps with speculation. See *Robar*, 157 Vt. at 391, 601 A.2d at 1378 (evidence must support more than mere suspicion or conjecture).

After careful review of the record in the light most favorable to the State, we conclude that a jury could not properly find defendant guilty beyond a reasonable doubt. The evidence established that defendant carried on an adulterous affair, wanted to leave her husband for Olmstead but was concerned about losing her house and children, lied when she denied knowing about an increase in her husband's life insurance, and said she would be better off if her husband were dead. Knowing of the mutual hostility between Olmstead and her husband, she threatened to start sleeping with her husband again unless Olmstead "proved himself." The fatal trip to Veronica's was planned in advance, and defendant drove to the tavern and parked in the back. After a fairly long drive to the tavern, defendant and her husband stayed only briefly. An individual fitting Olmstead's general description and a truck similar to his were seen in the area around the time of the assault. Defendant failed to direct the bar patrons to the murder scene immediately. Shortly after the killing, defendant and Olmstead were in regular contact, and Olmstead told defendant that he had "proven himself."

The prosecution asked the jury to infer from this evidence that defendant and Olmstead planned Michael Durenleau's death, or that defendant incited Olmstead to kill Durenleau. The State's evidence that she feared that a divorce would deprive her of her house and children, that she lied about knowing of her husband's insurance, and that she would have been better off if her husband were dead may have fairly established a motive, but no more. The only evidence that defendant incited Olmstead or procured his actions was the ambiguous statement that he had to "prove himself." The State presented no other evidence to warrant an inference that defendant intended that Olmstead prove himself through killing her husband. Cf. *State v. Ryan*, 135 Vt. 491, 493, 380 A.2d 525, 526–27 (1977) (defendant was guilty of counselling or otherwise procuring murder when he told co-defendant that she "had to kill" victim to prove her love). Olmstead told defendant after the killing that he had "proven himself," but even assuming this was a confession, without further evidence, the jury could only speculate that he had proven himself through means dictated by defendant.

If Olmstead had lain in wait and ambushed Durenleau, the only evidence of defendant's participation was the fact that the

reconciliation celebration had been planned in advance, that defendant drove and parked behind the bar, that they stayed only briefly, and that she did not immediately direct people to the rear of the building. Without additional evidence, the jury was left to speculate that defendant and Olmstead had orchestrated the attack. The thin evidentiary record raises considerable doubt that defendant assisted in her husband's murder.

In cases in which this Court has upheld convictions based solely on circumstantial evidence, the prosecution had erected a tighter evidentiary framework. See *State v. Warner*, 151 Vt. at 470–72, 560 A.2d at 386–87 (sufficient circumstantial evidence to support conviction for driving under the influence where defendant was clearly intoxicated at police station, refused ride from police, made no phone calls before leaving police headquarters, had last been seen headed for his vehicle, was found ten minutes later with his vehicle parked outside his home, and no other vehicles had driven into police lot during relevant time period); *State v. Derouchie*, 140 Vt. 437, 440–42, 440 A.2d 146, 147–48 (1981) (adequate circumstantial evidence that defendant guilty of operating motor vehicle without owner's consent where defendant seen walking slowly near van with keys left inside, man fitting general description of defendant seen driving van after it was reported missing, van found with all but ignition key inside, defendant subsequently found inside van attempting to start it, and ignition key found on floor after his apprehension by police); *State v. Bourassa*, 137 Vt. 62, 64–65, 68–69, 399 A.2d 507, 509–12 (1979) (sufficient circumstantial evidence where witness saw man fitting defendant's description break into pharmacy late at night, police saw man of same description run into woods, bloodhound led police to spot where defendant had hidden himself, defendant admitted being with co-defendant earlier in the night, and defendant's alibi proved unfounded).

■■ The jury may employ rational inferences to bridge factual gaps left by circumstantial evidence, but at some point rational inference leaves off and speculation begins. In this case, a guilty verdict resulted from jury conjecture and speculation supplementing a meager evidentiary record of defendant's involvement in her husband's death. Defendant may have been happier without her spouse, and may have unwisely continued to associate with Olmstead, a suspected murderer, but the evidence does not permit rational inferences sufficient to establish guilt beyond a reasonable doubt. Therefore, we reverse the conviction and direct entry of a judgment of acquittal. We do not readily overturn a jury's determination, but

this Court cannot shrink from its duty to protect an individual's due process right to conviction only by evidence of guilt beyond a reasonable doubt.

Since double jeopardy bars her retrial, *Robar*, 157 Vt. at 396, 601 A.2d at 1381, we do not reach defendant's other claimed errors.

*The judgment of conviction is reversed, and a judgment of acquittal is entered.*